Thank you. May it please the Court, Counsel, Brandon Williams on behalf of Appellant Amber Curtis. I'm having a little trouble hearing you. The problem in this case is that the ALJ determined at Step 2 of the sequential evaluation that the appellant had severe mental impairment. However, the ALJ failed to account for any mental limitations in the residual functional capacity, the RFC. And that in itself fails to comport with Social Security regulations and the sequential disability analysis. If you consider, it's cited in my brief, and I'm looking at CFR 416920A. And this is the regulation governing the ALJ's duty at Steps 2 and 3 of the sequential evaluation to assess the claimant's limitations in three distinct areas, activities of daily living, social functioning, and concentration, persistence, and pace. And looking at the statute, the regulation, like the overall, just like the overall sequential disability evaluation, it leaves no room for the ALJ to find a severe mental impairment, yet fail to include. Well, but we know from the case law and the regulations and everything that at Step 2, the identification of a severe impairment is only like a threshold kind of standard. It can be very minimal. You just need to get through there, and then you move on to the rest of the analysis. That's correct, Your Honor. And That doesn't mean that just because at Step 2 that the ALJ has identified an impairment, a severe impairment, whatever this test standard is, that that automatically gets you to the end that you're, you know, that those impairments must be included in the RFC. Walking through the regulation, it's my position that a finding of a severe mental impairment indeed does require some inclusion in the RFC of a mental limitation to account for that severe mental impairment. And just looking at the regulations, they'll say that if we find moderate difficulties in concentration, persistence, and pace at Step 2, we'll find that you have a severe mental impairment. Then it talks about moving on to the third step to address the listing analysis. Then it says if you have a severe mental impairment that does not meet a listing, we will then assess your residual functional capacity. And perhaps the regulation, the whole arrangement clearly contemplates that a finding of a severe mental impairment necessarily requires inclusion of some mental limitation in the RFC. It's a matter of the ALJ's obligation to account for all limitations, and a severe mental impairment necessarily, by definition, gives rise to limitations that are required to be represented in the RFC. Perhaps think of it this way. If an ALJ, let's say that you have a mental health case only, but no physical impairment, and the ALJ finds a severe mental impairment at Step 2, then we get to the RFC. There's no room in the regulations or the sequential disability analysis for the ALJ to just end it there. He's required to assess the limitations in the RFC. And allowing the ALJ to find a severe mental impairment and permitting him to include no mental limitations in the RFC would indeed lead to that result, which fails to comport with the regulations. And it's, I mean, as a matter, my position is as a matter of law, if the ALJ finds a severe mental impairment at Step 2, the RFC must include some measure of mental limitation. Let me ask you this. I understand your argument. It's very clear to me. And doesn't our case law require that where the ALJ is found, a severe medically determinable impairment at Step two of the sequential analysis, all medically determinable impairments must be considered in the remaining steps of the sequential analysis. That's the gist of your argument. That what you said is entirely correct, Your Honor. As far as the gist of my. Why did it take you so long to say that? Well, because the. I mean, that's my that's my case. Pardon me, Your Honor. Hill versus Astro. Have you read that case? Yeah, I'm not familiar with it at the moment, Your Honor. I'll send you a gum sheet with a citation. Thank you. Addressing what your question, Your Honor, or comment. The the analysis of step two is is, again, a it's a de minimis threshold to to keep out frivolous claims. And but that that analysis is very confined. And the ALJ findings are prescribed by statute. But when you get to the RFC, it's an open field. And but the way the whole arrangement works is that the ALJ is obligation to address all relevant evidence in the record and account for severe and non-severe impairments necessitates mental limitations in the RFC in the face of a severe mental impairment finding. That's step two. I don't know if I addressed your your point. Yeah, you're doing fine. Maybe you could just spend a minute since your time is running low on your second argument. Oh, certainly. With the third party statements, the ALJ mischaracter, the third party statements clearly relay described Miss Curtis's limitations. But in detail, the ALJ doesn't. The ALJ mischaracterizes their statements as, in fact, supporting the ALJ's position. And the ALJ really skirts the limitations and symptoms they describe. And that's clearly, flatly an erroneous analysis of those issues, of those statements. And addressing the Commissioner's Molina argument, the claimant, Miss Curtis, in her testimony, certainly she described some related limitations that were described in the statements. But the statements were much more elaborate, much more detailed, and they described things that she did not, nightmares, not getting along with family. So rejection of Miss Curtis's testimony does not amount to rejection of the third party statements as well. If the Court has no further questions at this moment. Ms. Shea. May it please the Court. My name is Terry Shea, appearing for the Commissioner of Social Security. Our position, you know, I understand what Judge Parkerson has said, but our position is our cases are very fact-specific. And you really have to look. Bring that mic down a little bit so we can hear you. Better? Better? Okay. Are very fact-specific. And you look to the record when you get to the residual functional capacity assessment. Now, counselors made a good point, that there is possibly one or two items in the mother's statement that were not in the claimant's statement. So that rejection of the claimant's statement would not reject the mother's statement. But you have to look at, okay, if she has nightmares, how does that impact her ability to do work? There's no connection there. Similarly, you know, the mother's statement is in the end of 2008. The friend's statement is in the end of 2009. And by that time, the living situation is described totally differently. In 2008, she's living with mom, her brother, her dad, and her child in a house or an apartment with them. And the next year, her friend describes her as much more independent. In the meantime, I'm sorry, go ahead. I mean, you're addressing the Molina point now. You're starting with that. So, I mean, I guess I understand the point that if the ALJ has given reasons for rejecting the claimant's own testimony that relate equally well to the testimony of third parties, this isn't testimony but it's functionally the same thing, then maybe it's not necessary for the ALJ to sort of go through the same exact analysis all over again. But here, it seems as though that's not really our situation because the claimants, I'm sorry, the third parties are giving their own firsthand accounts of what they observed with respect to the claimant. They're not relying on secondhand reports from the claimant herself. So it doesn't seem as though here, when the ALJ gives whatever reasons that are put on the record for rejecting the claimant's testimony, it doesn't seem as though they apply equally well. Well, I'm going a little bit to what would be a harmless error argument, Your Honor. Even if the mother and the friend described things that the claimant herself did not describe, then you would look at them in the context of, okay, how does that describe or verify mental health limitations that would impact her ability to work? I would point out. May I interrupt you for a minute, please? Sure. Here we have, I don't know what her age is now, but she was 34 years old. As a child, she suffered sexual abuse and domestic violence and lived on the streets and in shelters. She dropped out of school at age 15 because she was pregnant and the child's father was extremely abusive. At age 23, she was diagnosed with thyroid cancer. Ninety nine percent of the thyroid was removed. She struggled with substance abuse for years, but has been sober since becoming pregnant. Her youngest son. Pregnant with her youngest son in 2007, she's been repeatedly diagnosed with major depressive disorder, anxiety and post-traumatic stress disorder. And her symptoms include fear of leaving her house, irrational thoughts of being attacked, fear of losing her sobriety and nightmares. And she's morbidly obese. She's five feet, seven inches in height and weighs over 400 pounds. She's diabetic and has other physical impairments. Degenerative disease, joint disease in both knees, heart palpations and hypertension relating to Wolf Parkinson's white syndrome. Now, you know, there was certain suggested. I mean, I mean, she sounds like the wreck of the Hesperus to me. And yet you're telling us that who's going to hire this woman? Well, some suggestion was that she could she could get on the phone and do solicitations. That's the hardest kind of work you could ever do, particularly with someone who's suffering from these terrible mental problems. So I don't really know what's going on here when I read this. Well, respectfully, Your Honor. So what do you got to say to all that? Well, in fact, she did do that job. She did it for two months in 2009 after her mother's assessment, before her friend's assessment. And the only reason she left the job was because she said the other employees were drug users. Nothing to do with her own condition other than possibly her fear of remission. How much success? How much did she get paid doing that? I don't know, Your Honor. I don't believe it's in the record. Yeah. How much success did she have? Well, we take that from her own description to her doctor. So, you know, one time I had a an expert testify in a case. I was on the trial court. We had a we had a claimant who could only work at night. Couldn't go out in the daytime. That couldn't stand to be around people that couldn't stand noise. That had no ability to communicate with people. And this went on and on and on. And so we asked the expert, well, what jobs are there for this person in the national economy? And he didn't even stop to think. But so he said, here was his answer. Well, he could be a night watchman in a mortuary. All right. So you don't think that's. Well, I'm I don't know if that was, you know, it's one of the more unfortunate decisions you have to defend, perhaps. This sounds almost like that case. You know, claimant has not argued that she is not incredible. She did not dispute the L.J.'s credibility finding. And basically all of these things that you're saying are not really backed up by her medical records, where her doctor is saying she's resilient and she'll do fine and continue to improve as long as she continues to engage in treatment. She says in her own records, her mother said it wasn't. He wants her to lose what? Half her weight. They'll lose 200 pounds. Doctor. Doctor was talking about that was Dr. Boyd, who was her mental health doctor, her medication management doctor, I believe. But, you know, if everyone who is overweight is not able to live or to work. That's just not an assessment. I'm talking about a 400 pound woman who's had all this history in her life. From the time she was almost born. I mean, you know, aren't we a country? We're supposed to try to help people. Absolutely. Good. These benefits are available for the folks who are determined to need them. This is a very young woman. She recently completed her GED. She has overcome some horrendous things, certainly. But her own doctor feels that she's resilient and is doing better. In her own statement, well, her mother, even her mother says she's doing just fine with her child. Her friend, the statement from her friend is kind of odd in a way because some of the statements seem to be made in the first person. Now, she does it, but I do it. So it seems to go back and forth between the first person of the claimant and the third person of her. Why didn't the LLJ go to the third step? I'm sorry, Judge, I don't think I understand the question. OK. It was concluded that she had this residual functional capacity. Yes, sir. The LLJ didn't mention this depression or anxiety. When he was doing his it went from from a step to he never took that information. And when he got to step three, isn't he required to do that? I believe the judge did talk about the depression and anxiety at step three, Your Honor. If you're talking about the residual. He's first. Sorry? He's talking. I think Judge Fragerson's question was directed at the fourth step. OK. And we're back to our same position where the information you include in the residual functional capacity limitations, I'm going over my time. Go ahead and answer Judge Fragerson's question. Are the credible limitations that are documented in the record? The medical records don't document a lot of limitation. Even the statement from her mother doesn't document limitation in the workplace. She does say that she has nightmares, something the claimant herself does not say. Her friend says that she comes over to her house and plays in the backyard with her son and, you know, the two killed children while the claimant stays in the house and watches television. But does that document any need to do that? The problem with the record is that you have an undisputably or indisputably incredible claimant. You have medical records that don't document her claims. And you have two statements, one from her mom, one from her friend, who don't really set out items that it could be. What did they ALJ find on step two? Well, that's the de minimis finding that there are signs. What does it say, de minimis finding? Okay. That basically appears in the case law. Does it say de minimis? No. It does say severe limitation. It's been described as a term of art in the case law, which basically is that just means it's a de minimis threshold. Only someone with, you know, practically no problems is going to not get past this step. So, you know, are the case laws is supported our our position to some extent that basically step four and the residual functional capacity are in between three and four. It's not the same as step two, three. Okay. Here's here's what he says in his findings. Page three of this finding. The claimant has the following severe impairments. Obesity, degenerative joint disease, bilateral needs, needs, depression and anxiety. And over to another heading, I can't put my finger on it right now. Talks about her having right after anxiety, post-traumatic stress disorder. That's on the next page. Page four. Okay. All right. Well, our position would be, Your Honor, that simply having found that a person has severe impairments does not require inclusion in the functional limitations of the residual functional capacity unless those limitations are documented on the record in a credible manner. The ALJ found that didn't happen here. Well, yeah, I think he just he made some findings, but he just sort of generalized and and went on his way. All right. But basically what we have, we have this case that is under panic disorder. Well, the L.A.J. has found a severe medically determinable impairment. Step two of the sequential analysis. All medically determinable impairments must be considered in the remaining steps of the sequential analysis. That means you've got to consider why it doesn't mean you have to get the steps when you get to step three. Okay. We feel that the L.J. considered it as best he could. Claiming that's not what he's supposed to. He's supposed to consider it a step three and he did. Well, considering something is not the same as stating it in your written decision. Come on now. Come on now. How are we supposed to know? Supposed to comb through this long thing and figure out and give him the benefit of all these doubts. And if there were credible evidence of limitations due to her functional due to her mental impairments. And yes, we would expect that localized. Yeah. He found it severe. It's not the same thing. It's not the same thing. Yeah. So if I have a severe headache, then what would you call it? If I'm suffering severe pain, what would you call it? More than slight in the one more than slight, Your Honor. Well, let me let me know. I don't want to be personal, but I've got severe gunshot wounds on my legs. And it's a lot more than slight. I mean, we're not speaking the same English language. Well, I can only go back to the bottom line. This is a very individualized assessment. Different people adjust to different impairments in different ways. And the most that the ALJ can do is to see what's in the record and see what is documented. If an ALJ is expected to come up with limitations out of this, you know, out of the air based on a diagnosis, then he would be going beyond his expertise. The ALJ didn't do that. He looked at the analysis by doctors in the record. And to the extent that they were acceptable, credible analysis and they were supported, he went with those. He didn't make up his own conclusions about what limitations this claimant would have. And she does not argue that she has specific limitations in her briefing. She simply says the fact that it's severe means it has to be reflected in the functional limitations, even when there is no evidence of an impact in functional limitations. You would expect. Go ahead. I don't know that I worry about sometimes what was argued or not.    You can't say that we had a problem in a record. Those are the records. We've had that in a lot of cases. Does the Court have anything? No, I don't have anything. Thank you. Let's see. I don't know that you had any time left. One minute. You had some. Just given the lengthy exchange there. Thank you, Your Honor. Just a couple quick comments. First, I think the lengthy exchange between this Court and counsel underscores not only the legal error in failing to include mental limitations in the RFC, but it's just out of step with the evidence in this record. And then also I just wanted to point out very quickly that the V.E. found at Step 5 that the representative occupations that he could perform, all of them, were all SVP 3, which is incompatible with a severe mental impairment. So it wasn't really raised, but I wanted to just read it really quickly. So harmlessness is not an issue in this case. If the Court has any further questions. Hearing none. Thank you. Thank you very much. The matter is submitted.
judges: PREGERSON, PAEZ, WATFORD